UNITED STATES of America,
Plaintiff–Appellee,

v.

Todd A. D'ANTONI,
Defendant–Appellant.

No. 87–3158.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1988.

Decided Sept. 14, 1988.

Bonnie S. Musial, Musial Law Office, Madison, Wis., for defendant-appellant.

Daniel P. Bach, and John W. Vaudreuil, Asst. U.S. Attys., Madison, Wis., for plaintiff-appellee.

Before WOOD, Jr. and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

On July 6, 1987, a complaint was filed in the Western District of Wisconsin charging the defendant with distributing cocaine to a

fourteen-year-old female, and to a fifteen-year-old female who had died as a result. On July 15, a federal grand jury returned a two-count indictment against the defendant charging him with two counts (one for each of the two females) of distributing cocaine to a person under the age of twenty-one, in violation of 21 U.S.C. §§ 841(a)(1), 845(a). Count II charged the penalty enhancement set forth in 21 U.S.C. § 841(b)(1)(C).

The defendant pled not guilty, and filed two motions to suppress statements and evidence. An evidentiary hearing was held on August 27 and 28. In a report and recommendation dated October 16, Magistrate James Groh recommended that suppression be granted, finding that the defendant had been unlawfully detained under a pretext. The magistrate recommended that suppression be denied on all other grounds. In an order dated October 28, the district court denied the motions.

On October 31, the defendant entered a conditional plea of guilty to one count of distributing a controlled substance to a person under age twenty-one. On the same day, in a companion case, the defendant pled guilty to a charge of conspiring to murder a government witness against him in this case. The district court accepted the conditional plea on December 17, and dismissed one count of distribution and the penalty enhancement. The defendant was sentenced to imprisonment for a term of thirty-five years on the charge of distributing cocaine to the fifteen-year-old female, and to a consecutive five-year term on the charge of conspiring to kill a witness. He filed his notice of appeal on December 28.[1]

## I. BACKGROUND

On June 7, 1987, at 5:45 a.m., Officer Cameron McLay of the Madison Police Department was dispatched to 1558 Simpson Street, Apartment 7, in Madison, Wisconsin. Officer McLay, the first officer on the scene, had been dispatched to the apartment regarding a possible drug overdose. Officer McLay saw a young female, later identified as Tricia Schuh, on the floor of the apartment to whom paramedics were applying cardiopulmonary resuscitation. Officer McLay spoke with Richard Ales. Ales told McLay that it was his apartment and that he had been asleep in his bedroom when a person staying with him, the defendant Todd D'Antoni, had knocked on his door asking Ales to call an ambulance.

Officer McLay then spoke with the defendant, asking him what had happened. McLay did not place the defendant under arrest. The defendant identified himself and stated that he had met Schuh at a party earlier that evening and invited her back to his apartment to watch a movie.

McLay attempted to verify the defendant's identity because the defendant had no identification papers. At approximately 6:07 a.m., McLay ran a driver's license check through the law enforcement computer. The check revealed that a warrant was outstanding for the defendant based on a traffic conviction for operating a motor vehicle after license revocation. The warrant required the defendant to pay $738.40. Officer McLay then advised the defendant that he was under arrest, based on the outstanding warrant.

The officer transported the defendant to the Madison Police Station in his police car. En route to the station, McLay advised the defendant of his constitutional rights. Officer McLay then asked the defendant about the incident at the apartment.

McLay and the defendant arrived at the police station at approximately 6:30 a.m. The defendant was placed in an interview room pending the arrival of detectives.

At approximately 8:00 a.m., Detectives Jon Sippl and Kenneth Couture met with the defendant in the interview room at the police station. Detective Sippl advised the defendant of his rights, reading from a card provided by the Madison Police Department. Sippl asked the defendant if he understood his rights and whether he wished to speak with the detectives. The

1. The defendant does not appeal from the judgment entered against him in the companion case.

defendant stated that he had already given his story to the police officers. Sippl told him that they merely wanted to ask him more detailed questions. The defendant then answered the detectives' questions, although he indicated that he was tired and that he had been consuming various intoxicants earlier.

Toward the end of the defendant's interview, Detective Sippl asked him whether he would consent to a search of the apartment on Simpson Street. The defendant responded that he wanted to call his roommate, Richard Ales. He also asked to call an attorney. The detectives provided him with a telephone. The defendant made numerous, unsuccessful, phone calls to locate his attorney. He testified that he then called Ales, and talked with him regarding the search of the apartment. The defendant then agreed to sign the consent-to-search form.

Detective Sippl went to Simpson Street to search the apartment. Richard Ales signed another consent form. Meanwhile, Detective Couture and another detective asked the defendant if he would be willing to show them the location of the party where he had met Schuh. The defendant agreed to show the detectives the location, but he wanted to wait until a friend arrived at the police station with some bail money for him. After waiting for one-half hour, the defendant agreed to accompany the two detectives to the location of the party and meet with the defendant's friend when they returned.

After the three returned from viewing the party location, the defendant was taken to the Dane County Jail and booked on the traffic warrant. He was released from custody after posting the amount of money required by the warrant.

## II. ISSUES

The defendant presents the following issues for review. He first asserts that the police used the traffic warrant as a pretext to arrest the defendant and detain him at the police station in order to investigate the suspected overdose. Because of this pretextual arrest, the defendant contends, the defendant's statements, his consent to the search, and the identity of witnesses discovered after the defendant showed the police the location of the party, should all have been suppressed. The defendant next argues that after he invoked his right to remain silent, the police refused to honor it but instead continued to question him. On a similar vein, the defendant contends that after he requested the assistance of counsel the police, rather than suspending questioning until counsel was obtained, continued their interrogation of the defendant. The circumstances of detention and the defendant's personal condition rendered his statements involuntary, according to the defendant, and his consent to the search of his apartment was also involuntary. Finally, the defendant asserts that the district court abused its discretion by refusing to suppress the defendant's statements recorded in Officer McLay's reports as a sanction against the government on the grounds that the defendant was not prejudiced by the government's Rule 16 violation.

## III. DISCUSSION

### A. *Standard of Review*

A district court's denial of a motion to suppress evidence will be affirmed on appeal unless it is clearly erroneous. *See generally United States v. Binder,* 794 F.2d 1195, 1199 (7th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 234, 93 L.Ed.2d 159 (1986). We will rely on the district court's findings of fact absent a showing of clear error. *United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987). This standard applies to the district court's findings on the credibility of witnesses, findings that will not be reversed unless clearly erroneous. *Binder,* 794 F.2d at 1199. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "Where there are two permissible views of the evidence, the factfinder's choice be-

tween them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

## B. Pretextual Arrest

The magistrate found that because the defendant had been detained on a pretext, his statements and the evidence the police obtained as a result of this pretextual detention should be suppressed. The district court disagreed, finding that the arrest was objectively reasonable because, as the magistrate had found, the defendant "would have been taken into custody regardless of the fact that he was suspected of another offense." *United States v. D'Antoni*, No. 87–CR–61–S, slip op. at 13 (W.D.Wis. October 28, 1987) (order denying defendant's motion to suppress).

As the government concedes, it is well established that an arrest may not be used as a mere pretext to avoid the warrant requirement of the fourth amendment. *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). This rule generally has been confined to certain narrow circumstances. For example, when law enforcement officials follow a suspect, waiting for him to commit some minor offense, then arrest him and use the arrest to collect statements or evidence of another crime, courts may require suppression of the evidence gained in this way. *See, e.g., United States v. Keller*, 499 F.Supp. 415, 418 (N.D.Ill.1980).

The Fifth Circuit has announced a test for courts to apply to this type of challenge: "When a defendant alleges that an arrest was pretext to conduct an otherwise impermissible search, the appropriate inquiry is whether a reasonable officer would have made the arrest absent an illegitimate motive to search." *United States v. Johnson*, 815 F.2d 309, 315 (5th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). The Fifth Circuit, sitting *en banc*, found that the relevant principle of the Supreme Court cases dealing with fourth amendment violations is as follows: "so long as police do no more than they are legally permitted to do, their mo-

tives in doing so are irrelevant and hence not subject to inquiry." *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.1987) (en banc). *See Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *United States v. Villamonte–Marquez*, 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983); *Scott v. United States*, 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1978); *United States v. Robinson*, 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 476 n. 1, 38 L.Ed.2d 427 (1973).

In this case, the district court's decision denying the defendant's motion to suppress on the grounds that his arrest was pretextual is not clearly erroneous. The defendant was not followed by police waiting for him to commit some minor offense for which they could arrest him. Officer McLay took the routine step of verifying the defendant's identity by running a driver's license check through the police department's computer. This check gave McLay the information that the defendant was the subject of an outstanding traffic warrant. According to McLay's testimony, which the magistrate and the district court apparently found credible, his action in arresting the defendant on the warrant conformed with regular police procedures. Although his motive was not relevant, the magistrate found that McLay "was not motivated by a desire to question defendant further about the events of the preceding evening." *United States v. D'Antoni*, No. 87–CR–61–S, slip op. at 3–4 (W.D.Wis. Oct. 16, 1987) (magistrate's report and recommendation on motion to suppress). We therefore find that McLay's action in arresting the defendant was objectively reasonable, and not a proper basis for suppressing the defendant's statements.

The defendant argues that the police acted improperly in detaining him for questioning about Tricia Schuh instead of booking him on the traffic offense. Had the defendant been immediately processed through to Central Booking he would have been able to secure his release by paying the amount due for the traffic offense. The defendant did not have the full amount

due, however. He had with him $600 of the more than $700 owing under the traffic warrant. He had to make other arrangements for the balance due. He did this by calling a friend to come to the police station. Until the friend arrived, the defendant was not able to pay the amount owing and secure his release.

The defendant was not booked immediately, but was held for questioning. The district court found, and we agree, that the defendant consented to this questioning. Although the defendant and the government witnesses had predictably conflicting stories about the defendant's willingness to talk to the detectives, the magistrate and district court generally tended to credit the government witnesses over the defendant. The detectives testified that they would have booked the defendant had he indicated at any time that he did not wish to speak with them. Until his friend arrived with money for the defendant's fine, however, he would not have been released. The district court found that the defendant voluntarily continued to answer the detectives' questions. Because we agree with the district court that neither the arrest nor the detention were pretextual, we also agree that suppression for this reason would have been unwarranted.

## C. *Defendant's Invocation of His Right to Remain Silent*

The defendant submits that he invoked his right to remain silent after receiving *Miranda* warnings from the detectives at the station. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966). Therefore, he argues, his responses to the detectives' questions, his consent to the search of his apartment, and his identification of the location where the party was and the witnesses subsequently found as a result of this identification should all have been suppressed.[2] The magistrate and the district court both found that the defendant had waived his right to remain silent. The question, essentially, is one of credibility, and the mag-

istrate and the district court chose to credit the government witnesses' version of the event. "[W]hether a defendant waived his or her *Miranda* rights is a fact question subject to the clearly erroneous standard." *United States v. Hawkins*, 823 F.2d 1020, 1022 (7th Cir.1987).

According to the testimony of Detectives Sippl and Couture, the defendant was immediately advised of his rights at the beginning of their meeting with him. The defendant acknowledged that he had been advised of those rights earlier in the morning by another officer. When the officers asked the defendant whether he understood his rights, he replied that he did. In response to the detectives' inquiry whether he would answer their questions, the defendant commented, as he had to Officer McLay, that he had already provided all the information he had. Detective Sippl responded that the detectives would have more detailed questions to ask than he had answered earlier. The defendant then answered the detectives' questions. Although the detectives would have been well advised to obtain an express written waiver from the defendant of his right to remain silent, their failure to do so, as the magistrate recognized, was not fatal. *See North Carolina v. Butler*, 441 U.S. 369, 373–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979).

The defendant asserts that, by stating that he had provided to the officers all of the information he had, he invoked his right to remain silent. Even an equivocal indication of the desire to remain silent can suffice to invoke *Miranda's* requirement that interrogation cease. *See Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28; *Michigan v. Mosley*, 423 U.S. 96, 100–01, 96 S.Ct. 321, 324–25, 46 L.Ed.2d 313 (1975); *Christopher v. Florida*, 824 F.2d 836, 841 (11th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). Officers may ask questions intended to clarify whether the suspect was attempting to invoke his right to remain silent. *Id.* at 842. They must refrain, however, from any

---

2. The defendant apparently does not argue on appeal that his statements to Officer McLay in the car on the way to the police station should be suppressed.

words or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted). The line between clarification and interrogation is quite thin. Questions that burden the suspect in his attempt to assert his rights or attempt to wear down his resistance will not be considered permissible clarification. *See Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327–28. In determining whether questions are clarifying or interrogating, courts "focus [ ] primarily upon the perceptions of the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689.

We do not believe that the defendant intended at that time to invoke his right to remain silent in this case. He merely stated that he believed that he had little more information to give the officers. Even had the defendant equivocally invoked his right, Detective Sippl's comment was merely clarifying for the defendant that the detectives may have had more detailed questions than the defendant had previously answered. The question was not coercive in any way. Although Sippl's response was a clarifying comment rather than a clarifying question, we think the purpose was clearly to ensure only that the defendant knew what the detectives were really asking him. The question did not burden the defendant's right to remain silent.

■ The defendant also contends that if he is found to have waived his right to remain silent, his waiver was not voluntary. We view the question of voluntariness, a question of law, in light of the totality of the circumstances; no single criterion is controlling. *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The government has the burden to establish that the defendant's waiver was knowing and voluntary, and it must carry this burden by a preponderance of the evidence. *Colorado v. Con-*

*nelly,* 479 U.S. 157, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986).

■ Again, we note that it would be helpful if the police had asked the defendant to sign a waiver form. Although the existence or absence of a waiver form is not dispositive, it can be useful in demonstrating voluntariness. Based on the record from the suppression hearing, however, we find that the government carried its burden of demonstrating that the defendant's waiver of his right to remain silent was voluntary.

The record contains no evidence of threats or other coercive conduct on the part of the police. The defendant argues that coercion is demonstrated by examining the factors outlined by the Supreme Court in *Culombe v. Connecticut:* (1) the duration and conditions of the detention, (2) the manifest attitude of the police, and (3) the defendant's mental and physical state. 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

We do not believe that the duration or conditions of the detention were coercive. The defendant was detained in an interview room at the Madison Police Department for one to three hours. The room was unremarkable: about eight feet by twelve feet in size, with a half wall separating the interview area from a toilet area. The attitude of the police, as evidenced by the transcripts of the suppression hearing, was not coercive. When they arrived, the detectives gave the defendant his *Miranda* warnings for the second time that morning. When the defendant expressed doubt that he had anything else to tell them, the detectives simply said that they had more detailed questions to ask which, we have already found, was not a coercive comment. The defendant asserts that the detectives' failure to tell him that Schuh had died was a factor affecting the voluntariness of his waiver. As the Supreme Court has recently held, however, and as the magistrate found, merely withholding information regarding the subject of the interrogation does not render a *Miranda* waiver involuntary; additional information goes only to the wisdom of the waiver, not its nature.

Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987). The defendant also argues that his mental and physical state was such that he could not voluntarily waive his rights. The defendant had been drinking and smoking marijuana during the past twenty-four hours, and had had no sleep the previous night. The defendant himself, however, testified that he had had no alcohol in the five or six hours prior to the interview, and that he understood the detectives' questions. Moreover, the interrogation was not lengthy or arduous: it lasted less than half an hour. We agree with the magistrate and district court that the defendant's statements to the detectives were made voluntarily.

### D. *Defendant's Invocation of His Right to Counsel*

Although the defendant insists that he requested counsel repeatedly throughout his interview with the detectives, the magistrate and the district court credited the testimony of the detectives who stated that defendant's only request for counsel came at the end of their interview after they had asked the defendant if he would consent to a search of his apartment. The defendant then requested permission to use the telephone to call his roommate, Richard Ales, and his attorney. The detectives immediately honored this request, allowing him to use a telephone in the station to make several calls. The defendant was unable to reach his attorney, but he did talk to his roommate. After his telephone calls, one of the detectives inquired whether the defendant desired to discuss further his willingness to consent to the search.

It is well settled that when a person in custody requests counsel all questioning must cease until counsel has been made available, unless the person in custody initiates further communication with the police. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Arizona v. Roberson,* —— U.S. ——, 108 S.Ct. 2093, 2095, 100 L.Ed.2d 704 (1988). This bright-line rule

> serves the purpose of providing "clear and unequivocal" guidelines to the law

enforcement profession. Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

*Roberson,* 108 S.Ct. at 2098 (quoting *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85).

The detectives arguably violated this bright-line rule when they asked the defendant after his unsuccessful attempts to reach his attorney whether he wished to discuss his consent to the search of his apartment. The cases do not speak in terms of allowing a person in custody the *opportunity* to seek counsel, they speak of making an attorney available. The detectives, however, did not ask for more detailed information about the case, but only about what the defendant wanted to do about a possible search.

Even assuming that the detectives violated the defendant's right to counsel, this violation had little practical effect in the circumstances of this case. The defendant did not request counsel until the close of his interview with the detectives, and after he had already summarized for them the events of the evening before. The defendant had also provided similar information to Officer McLay earlier that morning. These statements need not be suppressed. After the defendant asserted his right to counsel, the detectives gained only the defendant's consent to search his apartment, and the defendant's identification of the party location. We find that the police did not need the defendant's cooperation to gain this information.

█ Even if we assume that it was error to fail to suppress the defendant's statements, and the information he provided after he asserted his right to counsel, the error under the circumstances of this case was harmless beyond a reasonable doubt.

*See Milton v. Wainwright,* 407 U.S. 371, 372, 92 S.Ct. 2174, 2175, 33 L.Ed.2d 1 (1972); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The evidence gained from the defendant added nothing to the proceedings, and therefore cannot be said to have contributed to the defendant's conviction. *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963).

■ The defendant's consent to search the apartment was not necessary. Ales had originally told the police it was his apartment. Although the defendant had had his belongings in the apartment for a week to a week and a half, he had stayed there only two nights during that time. He never signed a lease or paid rent. The defendant himself expressed concern to the police that he could not give consent to the search without first speaking with Ales, because it was Ales's apartment. After he spoke to Ales, the defendant agreed to sign the consent form. Once they arrived at the apartment, the officers obtained signed consent forms from Ales and his girlfriend as well.

In *United States v. Miroff,* we found valid a search of a guest bedroom for which consent was obtained from the host. On the facts of that case, we had "little trouble with the present issue insofar as the consent to search the room was concerned. Permission to search was obtained from a third party who possessed at the very least common authority over the bedroom sought to be inspected." 606 F.2d 777, 778–79 (7th Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *see United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). There was evidence that the guests had told the host that no contraband was present in the bedroom, and we found that the guests "must be regarded as having assumed the risk that one with whom they shared the common area might properly permit that common area to be searched, particularly when the sharer was the dominant or controlling party in the general premises." *Miroff,* 606 F.2d at

779. The area, a bedroom in which the guests were staying, was found to be a common area because the host kept personal and family belongings in the room as well.

In this case, as in *Miroff,* we believe that the defendant must be regarded as having assumed the risk that the residents of the apartment would permit a search of the bedroom. The defendant had moved his belongings into the apartment, essentially for storage it seems, because he testified that out of the week to week and a half that his belongings had been in the apartment, he had spent only two nights there himself. It is reasonable to believe that during this time the residents of the apartment who paid the rent and, it appears, were there continuously, could have found it necessary to move the defendant's belongings for a variety of reasons convenient to them. Had the defendant been concerned about the inviolability of his possessions he would not have left them unattended and unsecured. We believe that the residents of the apartment were fully able to consent to a search of the entire premises, including the bedroom where the defendant occasionally stayed. Therefore, we find that the defendant's consent, which even he did not believe he could give, was not necessary to allow the police to search the area.

■ After the defendant had asked to speak to his attorney, but before he had that opportunity, he agreed to show the detectives where the party at which he had met Schuh had been held. The police were thus able to locate witnesses from the party. This evidence also was arguably obtained through a violation of the defendant's right to counsel. If, however, the police would inevitably have discovered the location of the party and the identity of the witnesses, then there was no reason to suppress the evidence. "Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct." *Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 2510, 81 L.Ed.2d 377 (1984)

(emphasis in original). In the *Williams* case, the police coerced the defendant to tell them the location of the victim's body, which had purposely been hidden in a field. The defendant's statements were eventually suppressed, but the location of the body was not, because, as the Court found, search teams were present in the area and would have located the body independently within a short time. The Court thus held that evidence regarding the victim's body was admissible because although the body was actually found through a violation of the defendant's right to counsel, it would inevitably have been discovered by the search teams.

In this case the evidence the defendant seeks to suppress is the location of a party he and the victim had attended. The defendant told Officer McLay when he was first questioned that he had met Schuh at a party. It is undisputed that others attended the party, although it is not clear how many. There is little reason to believe that the party's location would have long remained unknown. There is no suggestion that the party was a secret; to the contrary, it was one of several parties prompted by the local high school graduation. One or more of the people present no doubt would have been willing to come forward once the victim's death was made public as they were not personally involved in the events that occurred after the party. It is also likely that others not attending were aware of the party. According to the complaint, one of the victim's friends, Rebecca Reynolds, spoke with Detective Burdette Fraser about the party and Schuh's death the same day they occurred. Although this point was not addressed directly below, it seems clear from the record that the police would inevitably and easily have discovered the location of the party without the defendant's help. Suppression of the party location and the identity of the witnesses the police discovered there is therefore not warranted.

## E. *Government's Rule 16 Violation*

The defendant contends that the government failed to timely comply with the court's order to provide all Rule 16 discovery. Fed.R.Crim.P. 16.[3] Pursuant to the order, the defendant's attorney and the government's attorney discussed discovery, and as a result of the discussion, the government provided the defendant with what it represented to be all of its Rule 16 discovery on July 20, 1987. The defendant filed his motions to suppress on July 29, 1987. These motions did not include a motion to suppress statements made to Officer McLay, because the government had not provided these statements to the defendant as part of the Rule 16 discovery.

On August 6, 1987, the government provided additional discovery, including Officer McLay's report containing the defendant's statements. The defendant then moved to suppress these additional statements as a sanction for the government's failure to comply with the court's Rule 16 order. Fed.R.Crim.P. 16(d)(2). The court declined to apply this sanction.

Our review of the court's denial of sanctions is governed by the abuse of discretion standard. "Remedial action under this rule is committed to the sound discretion of the district court, and we will reverse only for abuse of discretion prejudicial to the substantial rights of the defendant." *United States v. Koopmans*, 757 F.2d 901, 906 (7th Cir.1985).

---

**3.** Federal Rule of Criminal Procedure 16(a)(1)(A) provides in pertinent part as follows:

Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: ... the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent....

Rule 16(d)(2) provides in pertinent part as follows:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

We do not believe that the district court abused its discretion in denying the defendant's request for suppression as a sanction against the government's delay. Although it is unclear what the reasons for the delay may have been, the delay was very short and does not seem to have given the government any tactical advantage. Moreover, the defendant suffered no prejudice from the delay. He was directed on July 31 to file a supplemental affidavit by August 10 regarding the specific statements he sought to suppress. The defendant received the McLay report prior to the August 10 deadline. While this report was not attached to the affidavit filed on August 10, the defendant did use a page of the report in the brief filed on that date. He also addressed the statements in the McLay report in his reply brief on the motions to suppress. The defendant's challenges were fully considered on their merits at the evidentiary hearing on August 27 and 28.

The defendant argues that prejudice is not a necessary prerequisite to suppression, relying on *United States v. Campagnuolo*, 592 F.2d 852 (5th Cir.1979). The *Campagnuolo* case provides little support for the defendant's argument. In that case, the prosecutor withheld discovery of a defendant's statement for three years after the Rule 16 discovery order was entered. The prosecutor failed to disclose the statement until the eve of trial. Given that flagrant disregard of the discovery order, the Fifth Circuit held that the trial court acted within its discretion in suppressing the statement. *Id.* at 858. Here, the defendant has made no showing that he was prejudiced by the government's short delay in providing him with the McLay report, and we do not believe that suppression is in order as a prophylactic measure, as it was in *Campagnuolo* even absent a showing of prejudice. The defendant's rights were fully protected when the court addressed the defendant's challenges to the McLay report on their merits. The district court's denial of suppression of the McLay report was not an abuse of discretion.

## IV.   CONCLUSION

We have found that the defendant's arrest and detention were not pretextual, nor was his right to remain silent violated. Suppression of the evidence for these reasons was therefore not warranted, and we affirm the district court in these respects. Neither did the court abuse its discretion by denying suppression as a sanction for the government's failure to timely comply with its Rule 16 order. We find, however, that the government did violate the defendant's right to consult with counsel, and the defendant's consent to search obtained after that violation therefore should have been deemed ineffective. As we have mentioned, however, this error was harmless. The defendant's consent to the search of Richard Ales's apartment was unnecessary. As to the defendant's identification of the location of the party, that evidence should not have been suppressed because the police would inevitably have discovered that information without the defendant's cooperation. We therefore find that the district court's judgment should be

AFFIRMED.